STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| Appeal of Albert, <u>et al.</u> | } | Docket No. 110-6-03 Vtec |
| | } | |
| | } | |

<u>Decision and Order on Motions for Reconsideration</u>
<u>and Motion to Amend Statement of Questions</u>

Appellants are represented by Stephanie J. Kaplan, Esq.; Appellee-Applicant Ethan Allen Holdings, LLC, is represented by Edward D. Fitzpatrick, Esq.; and the Town of Shelburne is represented by Jill E. Spinelli, Esq. The parties moved for reconsideration of various aspects of the extensive decision and order issued on the merits of this matter; Appellants also moved to amend the Statement of Questions to add an issue for the Court's consideration.

We have fully reviewed the evidence, the requests for findings and legal memoranda, and the arguments made in support of the parties' motions. We address the issues raised by the parties' motions in the order in which they appear in the decision.

With regard to the Court's findings in the first full paragraph on page 9 of the decision, Appellants argue that the importation of large amounts of fill materials to the site will violate §§800(2) and 810(2) of the Subdivision Regulations. The Court declines to alter its decision in this respect. The issue during trial with regard to the imported fill materials was that they not disturb the calcareous ecosystems on the property. Therefore, fill that is matched to the site in those characteristics should avoid an adverse effect on the property's plant communities and meet the requirements of §§800(2) and 810(2) of the Subdivision

1

Regulations. Any redesign of the area of the single-family lots will have to address the amount of fill to be placed on or removed from the lots or the roadway. With respect to the area of the multi-family lots, the soils have had greater disturbance and the vegetation in that area is not at risk from the importation of fill.

With regard to the Court's findings on page 11 of the decision, Appellants argue that it is inaccurate to use the elevation line of 235 feet above sea level, even as an approximated description of the forested area, while Appellee-Applicant argues that the forested area does not extend onto lots 20, 21, and 22. The Court declines to alter its decision in this respect. Exhibit 10, containing the mapping of the eighteen yellow oak trees, shows that one of a cluster of three yellow oaks is located at the northwesterly corner of Lot 20 and the southwesterly corner of Lot 21, while another is located at the northwesterly corner of Lot 24, supporting an interpolation of the forested area between the two, along the westerly edge of Lots 20, 21, 22, 23 and 24. Various witnesses testified regarding the extent of the forested area, using differing landmarks and generally pointing to areas on the exhibits. The Court approximation of the forested area was used in the decision to show that the forested area has not been mapped on the property, and that the features to be protected must be mapped before the single-family portion of the property can be redesigned, as discussed on pages 19 and 20 of the decision.

With regard to the Court's findings in the first full paragraph on page 17 of the decision, Appellants argue that the evidence does not support a finding that blasting could occur at all, even for a few seconds in each construction season, without causing the bobcat population to abandon use of the adjacent cliff property. The Court declines to alter its decision in this respect. The evidence supported the Court's finding, based on the evidence of the bobcat life cycle, that "it is probable" that a construction schedule could be

2

developed in the future, in consultation with wildlife experts, to allow some amount of blasting and the use of heavy machinery. For work on the multi-family buildings, such consultation must occur and such a schedule be approved by the DRB before any blasting or use of construction machinery may commence. With respect to the single-family area of the project, it must be redesigned and approved, including any proposal for blasting.

With regard to the Court's analysis in the second full paragraph on page 17 of the decision, Appellants point out that no Act 250 permit has been issued for the project. The Court agrees that the form of the statement beginning "the fact that the project has received" is at least misleading, and that the sentence is hereby altered to read as follows, with changed material indicated in **bold**:

> As the Shelburne ordinances do not adopt the criteria of the state's land use law, Act 250 (10 V.S.A. Chapter 151), **even if a project has** received an Act 250 permit, **such a permit would not be** dispositive of the analysis under the municipal ordinances and plan.

With regard to the Court's analysis in the first full paragraph on page 18 of the decision, Appellants argue that the number of alterations in the PRD proposal that would be required for its potential approval should result in a finding that the land is simply unsuitable for development under §800(1) of the Subdivision Regulations. The Court declines to alter its decision in this respect. Appellee-Applicant is entitled to develop a revised proposal and to submit it to the Planning Commission for ruling. This criterion only assesses whether the existence of these features would be "harmful to the safety, health and general welfare of the inhabitants of the PRD or its surrounding areas." As stated in the decision, despite the challenges of the site due to its rock formations and topography, those features do not make it <u>intrinsically</u> unsuitable for some degree of development. It will be for the Planning Commission to assess in the first instance whether

3

any particular redesign of the PRD meets the criteria in the regulations.

With regard to the Court's analysis beginning on the first full paragraph on page 19 of the decision, Appellee-Applicant argues that consideration of off-site impacts of the proposed PRD is not warranted by the Subdivision Regulations or the Comprehensive Plan, and that the Court should not consider whether the proposed project complies with §800(7) of the Subdivision Regulations because it was not referenced in the Statement of Questions. The Court declines to alter its decision in this respect.

In footnote 8 on page 19, the decision noted:

Nothing in the text of §800(2) limits the evaluation to existing features on the project property. That is, for example, if a project were proposed for the shores of Lake Champlain or Shelburne Pond, or adjacent to a protected wetland, under this language it would be necessary to analyze whether the proposal included due regard for the preservation and protection of those resources. See also §800(7).

As discussed in Terino v. Town of Hartford Zoning Board of Adjustment, 148 Vt. 610, 614 (1987), off-site factors may be considered unless the express language of the ordinance limits the analysis to on-site effects. Therefore, off-site habitat and other off-site effects must be considered under §800(2), regardless of whether §800(7) is brought into issue.

Appellants move to amend the Statement of Questions, not only after the trial, but after the decision was issued, to add §800(7) as a specific issue. While it is true that the effect of the proposal on the adjacent cliff habitat to the west was actively litigated during the eleven days of trial, the evidence presented on that subject was not directed to §800(7). The Statement of Questions defines the scope of the litigation well in advance of trial, so that the parties know what issues they will have to meet at trial. In the present case the Statement of Questions was further revised and agreed at trial. Under these circumstances, the motion to amend the Statement of Questions must therefore be denied. Of course, in

4

any further proceedings before the Planning Commission, §800(7) may be specifically addressed.

Appellants argue that the multi-family portion of the project also fails to meet 800(2) and 810(1). The Court declines to alter its decision in this respect, as the evidence was carefully analyzed on this point to make the distinction between the area of the proposed multi-unit buildings and the area of the proposed single-family lots.

Appellants also ask the Court to specify that the proposed PRD does not include due regard for the Dry Oak-Hickory-Hophornbeam forest. As discussed in the decision, the single-family portion of the proposed PRD does not include due regard for existing trees, and existing wildlife habitat, and may or may not include due regard for rock outcroppings, which are not mapped. To the extent that the forest is made up of existing trees, it therefore also does not include due regard for the preservation and protection of the Dry Oak-Hickory-Hophornbeam forest as a defined natural resource. However, this recognition does not change the Court's conclusion that, without additional restriction of the use of the westerly buffer area and without a redesign of the lot layout of the single-family PRD lots, the proposed PRD does not meet the requirements of §800(2) (or §800(7)).

With regard to the Court's analysis in the second paragraph on page 19 of the decision, Appellants argue that there was no evidence that a fence would be sufficient to protect the bobcats from human and pet activity. The Court declines to alter its decision in this respect, as the decision was not meant to and does not suggest that a fence would be sufficient. All that the decision states is that the level of protection required by the regulatory sections under discussion is not absolute, and that various different protective mechanisms may be possible to achieve the required level of protection. The decision specified that "[a]ll that the Court can determine from the evidence in the present proceeding is that the road location and lot layout of the proposed PRD has not sufficiently

5

taken into consideration the preservation or protection" of the specific features.

With regard to the Court's analysis in the second full paragraph on page 20 and the first paragraph of page 21 of the decision, Appellants argue that the approval of the multi-family units was premature and improper without approval of designated open space for the remainder of the project. The Court declines to alter its decision in this respect. Without the single-family portion of the project, there is ample open space for the recreational and open space needs of the multi-family portion of the project. If the single-family portion of the project is redesigned, it will be for the Planning Commission in that proceeding in the first instance to assure that the project as a whole has provided for an adequate amount of open space for both portions of the project.

With regard to the Court's analysis in the second full paragraph on page 21 of the decision, Appellants request that the Court change the phrase "it will be possible" to "it may be possible," as there is no basis to assume that a redesigned project would be able to comply with the regulations. The Court agrees that the intent of the following sentence:

> It will be possible to redesign the single-family portion of the PRD to provide a road and lot layout, an appropriate number of single-family lots, an appropriate amount of recreational open space, and the appropriate protection of those natural features.

was to indicate the potential for proposing a redesigned project that would comply with the regulations, and not to assure that such a redesigned project necessarily would comply with the regulations. Accordingly, that sentence is hereby changed as follows, with the changed material indicated in **bold**:

> **Based on the evidence submitted in this proceeding, it may well be** possible for Appellee-Applicant to redesign the single-family portion of the PRD to provide an appropriate road and lot layout, an appropriate number of single-family lots, an appropriate amount of recreational open space, and

6

the appropriate protection of those natural features.

With regard to the Court's analysis in the first full paragraph on page 22 of the decision, and regarding references to the Declaration of Covenants throughout the decision, Appellee-Applicant argues that it does not matter whether it or another entity would be constructing the project, as the Declaration would incorporate any conditions of permits applicable to the project. The Court declines to alter its decision in this respect. The issue is not whether it would be Appellee-Applicant or another developer that would be constructing the project as a whole, but whether the individual homeowners would be bound by the permit's requirements as to blasting and fill materials, protection of trees, and areas of no-cutting or non-disturbance on each individual house lot. At trial, Appellee-Applicant's witnesses reiterated that while Appellee-Applicant would be constructing the development as a whole, it would be each individual house lot purchaser who would be deciding how much land disturbance or fill would be required for design and construction of a particular house on that lot. The purpose of the Court's references to the Declaration of Covenants was to assure that the individual homeowners would be bound by the project's permit restrictions.

With regard to the Court's analysis of the applicability of certain sections of the Comprehensive Plan, beginning at the bottom of page 24 of the decision, Appellee-Applicants argue that the Plan was construed too broadly. The Court analyzed each specific plan section in relation to its implementing regulations, and declines to alter its decision in this respect.

With regard to the Court's analysis of the applicability of Rural Lands Objective 1, of the Comprehensive Plan, at the top of page 26 of the decision, Appellants argue that the

7

testimony of Mark Lapin can be used to specify which natural features are indicated by the two dots on the map, and demonstrated that the proposed PRD fails to meet this objective. The Court's analysis of this Objective does not constitute a finding as to whether or not the PRD accomplishes this objective of the Plan. Rather, it was a legal analysis that the map and the Plan, read together, do not provide enough specificity to have a regulatory effect. This remains a hortatory, not a regulatory section of the Plan. The Court analyzed each specific plan section in relation to its implementing regulations, and declines to alter its decision in this respect.

With regard to the Court's analysis in the last paragraph on page 26 of the decision, continuing onto page 27, Appellants argue that the Court should have concluded not only that the proposed PRD fails to meet this objective by failing to provide protection for the essential bobcat habitat on the adjacent calcareous cliff , but also should have concluded that the construction of the multi-family units eliminates habitat for cottontail, ruffed grouse, red fox, and deer. Appellants seek a condition that fencing should be required to the west of the multi-family units to protect bobcat habitat in that location, and argue that the PRD as a whole should be denied due to its failure to protect wildlife habitat. The Court declines to alter its decision in this respect. The area proposed for the multi-family units had been sufficiently disturbed over time so as not to warrant protection as wildlife habitat for the listed species, which have not been shown to lack sufficient area habitat. The evidence did not support a finding that the adjacent cliff habitat, as habitat, extended southerly throughout the area to the west of the multi-family units. However, Appellants will be free to participate at the Planning Commission as it considers any proposed redesign of the project as a whole, or of the single-family portion of the project, and will be free to present additional evidence and argument in support of their position that fencing or protection of the area to the west of the single-family portion of the project may be

8

ineffective without similar protection of the area to the west of the multi-family portion of the project.

With regard to the Court's analysis in the second and third paragraphs on page 27 of the decision, Appellee-Applicant argues that the plan was construed too broadly and should not apply to off-site effects of the proposed PRD. The Court declines to alter its decision in this respect. The language of Comprehensive Plan "Natural & Visual Resources and Land Conservation" Objective 3 that "[t]he alteration or disturbance of significant natural areas shall be minimized" is not limited to areas on the same site as a proposed project.

With regard to the Court's analysis in the fifth paragraph on page 27 of the decision, Appellants argue that the Court should make the same finding with respect to the multi-family area of the proposed PRD, that is, that it does not maintain viable habitat conditions for bobcat use of the important adjacent temperate calcareous cliff habitat, and therefore also does not comply with Comprehensive Plan "Natural & Visual Resources and Land Conservation" Objective 4. Based on the evidence presented regarding the area to the west of the multi-family area of the proposed PRD, the Court declines to alter its decision in this respect.

With regard to the Court's analysis in the first full paragraph on page 29 of the decision, Appellee-Applicant argues that, without a definition of the term "forest management plan" in the regulations, that the cutting restrictions in the plan and the Declaration of Covenants should satisfy the requirement to provide a forest management plan. The Court declines to alter its decision in this respect, for the reasons already stated in the decision at page 29.

With regard to the Court's order in the first paragraph on page 30 of the decision, Appellants argue that the Court should not approve a portion of the project while denying another portion of the project. Appellants also argue that there is no time in the bobcat life cycle when blasting can be accomplished without causing them to abandon the cliff habitat, so that the PRD as a whole should be denied. In the alternative, the argue that their bobcat expert, Susan Morse, should be the consultant required to be used for developing the blasting schedule. The Court declines to alter its decision in this respect. The decision analyzed each element of the proposed project to determine whether it met or failed to meet each applicable section of the zoning and subdivision ordinances. Appellee-Applicant may well wish to avail itself of the expertise of Ms. Morse, but the Court will not require them to do so. As discussed above, Appellants will be free to participate at the Planning Commission as it considers any proposed redesign of the project as a whole, or of the single-family portion of the project, and will be free to present evidence and argument in support of their position.

Dated at Berlin, Vermont, this 21st day of March, 2006.

_____
Merideth Wright
Environmental Judge